IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JESSICA McDANIEL, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-0928-N |
| | § | |
| CREDIT SOLUTIONS OF | § | |
| AMERICA, INC. | § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Plaintiffs Jessica McDaniel, Matt McDaniel, Jennie DiBartolomeo, and Christopher Reynolds's motion for class certification [104], Plaintiffs' motion for partial summary judgment [72-3], and Defendant Credit Solutions of America, Inc.'s ("CSA") cross-motion for summary judgment [93]. For the reasons provided below, the Court (1) grants Plaintiffs' motion for class certification in part and denies it in part, (2) grants Plaintiffs' motion for summary judgment in part and denies it in part, and (3) grants CSA's cross-motion for summary judgment in part and denies it in part.[1]

## I. ORIGINS OF THE SUIT

This putative class action arises out of CSA's alleged violation of various provisions of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, the Texas

_____

[1]The Court also grants CSA's motion for leave to file briefs in excess of page limit [88].

Credit Services Organizations Act, TEX. FIN. CODE § 393.001, *et seq.* ("TCSOA"), and the

Texas Debt Management Services Act, TEX. FIN. CODE § 394.201, *et seq.* ("TDMSA").[2]

### A. CSA In General

CSA is a consumer debt settlement company that acts as a third-party intermediary for its clients and, where possible, negotiates a reduction in the amount of unsecured debt they owe. In exchange for its services, CSA charges its clients fifteen (15) percent of the total amount of debt that they "enroll" in the program. It does not accept or manage the funds that its clients use to pay their creditors; rather, it tells its clients to pay their creditors directly in accordance with the terms of the relevant settlement.

During the pendency of its negotiations, CSA advises its clients to stop making payments on their enrolled debts and, instead, set aside savings to fund the settlement amount. CSA recognizes that this might hurt its clients' credit score in the short-term. However, it represents to its clients that settlement of their debts will, in the long-run, improve their debt to income ratios and, as a result, their credit scores.

---

[2]Since the parties' briefing, the 82nd Texas legislature enacted, and the governor signed, Senate Bill (SB) 141, effective September 1, 2011. SB 141 changed the TDMSA in fairly significant ways. The Finance Commission of Texas also subsequently adopted amendments to the regulations regarding the TDMSA. However, the Court will analyze CSA's liability under the TDMSA as it existed at the time of CSA's relevant conduct and the time at which Plaintiffs commenced this suit. Therefore, unless otherwise noted, all citations in this Order are to the TDMSA as it existed before September 1, 2011.

### B. CSA's Specific Representations

CSA communicates with its potential clients in a number of ways, including through its website: www.creditsolutions.com.  The website contains general information about the company, as well as contact information for potential clients to set up a free consultation with a CSA representative.  Over time, the website has included various representations regarding CSA's impact on its clients' credit.  For instance, in February, March, and April 2007, the website stated:

> **How Will a Debt Settlement Program Affect My Credit?**
>
> Your credit is largely determined by two factors: your payment history and the amount of debt you have, or debt to income ratio.  Any debt management program will affect your credit in the beginning.  However, as you begin to pay off the accounts and obtain zero balances, you will ultimately lower your debt to income ratio and therefore improve that specific portion of your credit score.

Pls.' App. to Pls.' Partial Mot. for Summ. J. 193, 199 [73] (hereinafter "Pls.' App.").  From April 2007 to October 2007, the website also represented, among other things:

> Your foundation of improving your bad credit through our debt-relief service is a savings account. . . . Our debt-relief service also eases your way out of bad credit by reducing each debt into a more manageable one.

*Id.* at 87.

> Instead of borrowing a risky subprime loan, homebuyers can use our service to improve their bad credit score, and then obtain a more favorable mortgage loan.

*Id.* at 99.

> Our service eliminates bad credit and allows clients to purchase a new car without paying high interest rates.

*Id.* at 103.

> By seeking help through our debt relief service, you can
> banish bad credit faster.

*Id.* at 105.

> Our debt relief service can lead you beyond bad credit to
> your dream destination.

*Id.* at 110.

> [I]t's important to eliminate bad credit quickly and for
> less money and our debt relief service is geared just for
> that.

*Id.* at 112.

> Our debt relief service works with creditors to lower your
> debt balance, letting you repay your debt faster and
> putting bad credit in your past.

*Id.* at 120.  After November 19, 2008, CSA's website no longer contained any specific statements about the possible future effect of debt settlement on a customer's credit score. Def.'s App. to Def.'s Combined Br. in Opp'n to Pls.' Mot. for Partial Summ. J. & Cross Mot. for Summ. J. 10 [95-2] (hereinafter "Def.'s App.").

In addition to its website, CSA communicates with its potential clients by phone.  The enrollment process includes a telephone interview through which CSA obtains information from the potential client about his or her debts and overall financial situation.  In the course of the phone call, CSA representatives read from a telephone script.  The telephone scripts CSA used in the first quarter of 2007 included the following language:

> Ok, the next thing I like to explain to people is how it will affect their credit.
> First of all you won't be making payments each month, which will hurt your
> credit at first, but payment history is not the end all be all that credit card
> companies like to make you think.

Payment history is only 35% of your credit score, and affects your score positively or negatively for 6 months at a time.

So let me give you an example, let's say we pay off your first card 8 months into the program. Well, that card will stop negatively affecting you 6 months later, BUT it will positively affect you immediately because your debt to income ratio will improve!

Have you ever bought a house? . . . .

Yes . . . Do you remember when they ran your "ratios"? Remember how important that was? . . . That's because all they really care about when you buy a house is debt to income ratio and past mortgage history. We are fixing the most important part of your credit.

So, to make this simpler, in the first year your credit will go down, but in the 2nd year it will get better and by the time you're done with the program, it will be better than it is now.

Do you have a house or car payment? . . .  If yes . . . see with that paying positively on the two major purchases which will help outweigh even the short term payment affects [sic] to your credit.[3]

Pls.' App. at 55 [80] (emphasis removed).  CSA used similar phone scripts throughout most of 2007.  However, according to CSA, its representatives personalized and varied the scripts to "put some of the [sales representative's] personal spin on it and get the wording as the [sales representative] personally liked it."  Def.'s App. at 73 [95-3].

CSA does, and did, not represent, either through its telephone scripts or on its website, that its debt settlement program would change or repair any aspect of a client's existing credit record, history, or rating.  To the contrary, it indicated that its clients' credit might get worse before it got better.  *See, e.g.*, Pls.' App. at 52 [80] ("Since you are not making your monthly

---

[3]Although the parties filed these telephone scripts under seal, the Court sees no basis for confidentiality given that the scripts are intended to be disclosed to third parties on the phone.

payments, your payment and credit history will suffer but payment history is only 1/3 of your credit score.").

### C. CSA's Enrollment Package

Before CSA begins the debt settlement process or accepts any fees, it provides its clients with a "customer enrollment package." The customer enrollment package provides certain terms and disclosures and sets forth, among other things, the total amount of unsecured debt enrolled in the program, the estimated funds available to settle those debts, the total service fee CSA intends to collect, and CSA's fee schedule. The "terms and agreement" section of the customer enrollment package includes several disclaimers. For instance, it states: "Client agrees Company has not represented it will assist Client in the modification, improvement or correction of credit entries on Client's credit reports . . . ." Def.'s App. at 114-15 [90-6]. Further, each customer acknowledges: "Client also understand[s] creditors may impose other penalties as a result of delinquent payments, including but not limited to, the reporting of adverse information to credit bureaus." *Id.* Finally, it states:

> Client expressly acknowledges that . . . Client's credit score and credit history may be negatively affected if Client does not pay their regularly scheduled minimum credit payments. Additionally, Client expressly acknowledges that Client is entering this Agreement fully and completely aware of the risk of lawsuit, arbitration demand and damage to Client's credit score and credit history.

*Id.* (emphasis original). According to CSA, each of its clients signed the customer enrollment package.

### II. CLASS CERTIFICATION MOTION

Plaintiffs seek class certification of nationwide claims under CROA and TCSOA. They allege that CSA violated CROA by accepting payment before rendering service, 15 U.S.C. § 1679b(b), failing to provide disclosures, 15 U.S.C. § 1679c(a), and entering into agreements without specifically explaining what it will do for clients and approximately when it will do it, 15 U.S.C. § 1679d(b)(2). Pls.' Mot. for Class Certification 6. Plaintiffs allege that CSA violated TCSOA requirements because it did not provide detailed descriptions of its services, entered into contracts for periods of more than 180 days, and charged prior to performance. *See* TEX. FIN. CODE §§ 393.201(b)(2), 393.303. Plaintiffs also accuse CSA of violating TCSOA because it failed to post the requisite bonds for each of its locations and promised to fix bad credit without mentioning that bad credit may be resolved only if there are inaccuracies in the credit report. *See id.* §§ 393.105, 393.304(1)(B). Plaintiffs seek certification of a class that includes "all persons in the United States who signed a services contract with CSA and made at least one monthly fee payment to CSA pursuant to that agreement." Pls.' Mot. for Class Certification 7.

Plaintiffs also allege that CSA's Texas contracts are void because it did not register with the Texas Credit Commissioner, a requirement under TDMSA § 394.204. *See also* TEX. FIN. CODE § 394.215(a). Plaintiffs seek certification of a subclass that consists of "all persons who, at any time from September 1, 2005, to the present, and while a Texas resident, signed a services contract with CSA and made at least one monthly fee payment to CSA pursuant to that agreement." Pls.' Mot. for Class Certification 7. Plaintiff Reynolds would represent this subclass.

### A. Class Certification Standard

Plaintiffs may sue on behalf of a class only if the proposed class possesses: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005) (citation omitted); *see* FED. R. CIV. P. 23(a). Additionally, a party seeking class certification under Federal Rule of Civil Procedure 23(b)(3) must also show (1)"that questions common to the class members predominate over questions affecting only individual members and, (2) that class resolution is superior to alternative methods for adjudication of the controversy." *Feder*, 429 F.3d at 129 (citing FED. R. CIV. P. 23(3)(B)).

District courts have substantial discretion in determining whether to certify a class. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 408 (5th Cir. 1998). To operate within the framework of Rule 23, the Court must undertake a "rigorous analysis" of the proposed class action. *Unger v. Amedisys*, 401 F.3d 316, 320 (5th Cir. 2005). However, class certification determination should not be a "preliminary inquiry into the merits." *Id.* The Court will discuss the Rule 23(b)(3) requirements first because predominance and superiority pose the most significant challenges to this class certification.

### B. Rule 23(b) Requirements

*1. Predominance.* – As a threshold matter, the Court must perform a choice of law analysis to determine which issues predominate under the law governing the parties and the case. *See Cole v. Gen. Motors*, 484 F.3d 717, 724 (5th Cir. 2007) ("In a diversity class action . . . inherent in the predominance inquiry is a determination of which states' substantive laws will apply to the claims . . . because if multiple states' laws apply and those laws vary, the variations may impact whether common issues of law and fact predominate."); *Spence v. Glock GES.m.b.H*, 227 F.3d 308, 313 (5th Cir. 2000) ("The district court is required to know which law will apply before it makes its predominance determination."); *Gyarmathy & Assocs., Inc. v. TIG Ins. Co.*, 2003 WL 21339279, at *2-3 (N.D. Tex. 2003) (Godbey, J.).

In this case, the Court need only determine choice of law with regard to Plaintiffs' TCSOA claims as they relate to the nationwide class.  Since CROA is a federal claim, the Court need not perform a choice of law analysis for this cause of action.[4]  Additionally, because TDMSA applies to only Texas residents, *see* TEX. FIN. CODE §§ 394.202, 394.204, and only Texas residents comprise the proposed subclass under TDMSA, the Court need not perform a choice of law analysis to determine that Texas law applies to the subclass' claims under TDMSA.  The Court therefore first conducts a choice of law analysis for Plaintiffs' TCSOA claim and then considers predominance regarding Plaintiffs' remaining claims.

---

[4]CSA's contracts included a valid forum selection clause specifying that "[i]n the event of any dispute regarding this Agreement, Client and Company agree that venue of resolution shall be in the county and city of Dallas, Texas."  Def.'s App. at 115 [90]; *see* RESTATEMENT (SECOND) CONFLICT OF LAWS § 80 (1971) ("The parties' agreement as to the place of the action cannot oust a state of judicial jurisdiction, but such an agreement shall be given effect unless it is fair or unreasonable."); Order, Apr. 29, 2008 [19], *McDaniel v. CSA - Credit Solutions of Am., Inc.*, Civil Action No. C07-1815-JCC (W.D. Wa. 2008). Thus, this Court, sitting in Texas, has the power to certify a class based on CROA.

Federal courts apply the choice of law rules from the forum state – here, Texas. *See Spence*, 227 F.3d at 311 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Texas courts "use the ALI's 'most significant relationship test' for all choice of law cases except those contract cases in which the parties have agreed to a valid choice of law clause." *Id.*; *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). Thus, the Court must first ascertain whether this case is one of "those contract cases" where a valid choice of law clause applies before finding that Texas law controls and applying TCSOA to the putative class.[5]

Plaintiffs argue that Texas law applies to their TCSOA claims because CSA included a Texas choice of law provision in its contracts with consumers, and Texas enforces valid contractual choice of law provisions. The contractual provision at issue states:

> 11. **Choice of Law and Jurisdiction**: In the event of any dispute regarding this Agreement, Client and Company agree that venue of resolution shall be in the county and city of Dallas, Texas. Both Company and Client agree that the laws of the State of Texas shall govern any disputes arising from this Agreement.

Def.'s App. at 115 [90].

---

[5]Plaintiffs make much of the fact that CSA previously took the position "that the Texas choice-of-law provisions in its contracts are valid, and that the provisions of the contract apply not only to disputes over the contract itself, but also to any tort claims arising out of the relationship between Credit Solutions and consumers." Pls.' Br. in Reply to Pls.' Partial Mot. for Summ. J. and Br. in Opp'n to Def.'s Cross Mot. for Summ. J. 19 [109-1] (hereinafter Pls.' Reply). However, the Court must perform its own choice of law analysis. *See Canton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990) ("Although the parties agree that the choice of law clause contained in Canton's contract governs the choice of law analysis, our role as a federal court sitting in diversity requires application of the choice of law rules of the forum."); *Kreger v. Gen. Steel Corp.*, 2010 U.S. Dist. LEXIS 86043, at *32 (E.D. La. 2010) ("Although other circuits might have concluded that choice of law questions can be stipulated or waived, ours has not.") (citations omitted).

At the outset, the Court notes that the forum selection clause in the first sentence of CSA's contract provision is separate from the choice of law clause in the second sentence. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 793 (Tex. 2005). In *Holten*, the Texas Supreme Court stated:

> [Plaintiff] argues that the forum-selection clause is limited to disputes regarding "interpreting the terms of the contract," a phrase appearing in the same section but a preceding sentence. But the title of the paragraph [, "Controlling Law and Place of Suit"] shows that two different topics were addressed in it, and the forum-selection clause itself refers only to "any dispute between us" . . . . The parties were not required to put these two sentences in two different paragraphs to show that one did not modify the other.

*Id.* Similarly, CSA's contract contemplates two different subjects in the same section, as evidenced by the title of the paragraph: "Choice of Law and Jurisdiction." Def.'s App. at 115. Accordingly, the Court will examine CSA's choice of law provision – "Both Company and Client agree that the laws of the State of Texas shall govern any disputes arising from this Agreement" – separately from the forum selection clause immediately preceding it.

The wording of a contractual choice of law provision controls the types of claims it governs. While a broad choice of law clause may cover all actions arising from the parties' relationship, a "narrow choice of law clause does not address the entirety of the parties' relationship." *Canton*, 896 F.2d at 943 (applying Texas choice of law rules). Rather, in Texas, a narrow choice of law clause covers only disputes about the construction or application of the contract itself. *See id.*; *Benchmark Elecs., Inc. v. J. M. Huber Corp.*, 343 F.3d 719, 726-28 (5th Cir. 2003) (applying Texas choice of law rules); *Busse v. Pac. Cattle Feeding Fund #1, Ltd.*, 896 S.W.2d 807, 812-13 (Tex. App. – Texarkana 1995, writ denied). For example, in *Busse*, the Texarkana Court of Appeals found that a narrow clause did not

cover the plaintiffs' causes of action when their claims did not "arise from the contract itself, but from the Deceptive Trade Practices Act, the Texas Securities Act, and the [Texas] common law."  896 S.W.2d at 313.

Several Texas cases provide examples of either broad or narrow choice of law clauses. In *Canton*, the Fifth Circuit, applying Texas choice of law rules, illustrated a broad clause as one which "choose[s] a particular state's law to 'govern, construe[,] and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of the contract' . . . ." 846 F.2d at 943 n.3.  It found the contract at issue in that case to be a narrow one where the contract stated, "this Agreement shall be construed under the laws of the state of California." *See id.* at 942.  Other courts have found narrow clauses where the clauses state: "[the] Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York," *see Benchmark Elecs.*, 343 F.3d at 726-27, or "[t]his agreement and the rights and obligations of the parties arising hereto shall be construed in accordance with the laws of the State of Iowa, with venue in [certain Iowa counties]," *see Busse*, 896 S.W.2d at 812-13.

Here, CSA's choice of law provision more closely resembles a narrow clause governing only the contract itself, rather than a broad clause intended to cover any possible disputes between the parties.  Accordingly, the Court finds that the choice of law provision in CSA's contracts does not apply to Plaintiffs' TCSOA claims – claims that do not arise under the contract itself.

Because the Court finds that CSA's choice of law clause does not apply, the Court next must turn to the "most significant relationship" factors outlined in the Restatement

(Second) Conflict of Laws[6] to analyze choice of law on an issue-by-issue basis.  *See, e.g.,*

*Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000); *Duncan*, 665 S.W.2d

at 421 (issue-by-issue consideration); *see also Mayo*, 354 F.3d at 403; *Spence*, 227 F.3d at

311.  In order for a court to analyze choice of law under this test, "[t]he party seeking

certification of a nationwide class must . . . provide an extensive analysis of state law

variations to reveal whether these pose insuperable obstacles."  *Cole*, 484 F.3d at 724

(quotations omitted).  This is so because "in a class action governed by the laws of multiple

states . . . variations in state law may swamp any common issues and defeat predominance."

*Id.* (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)).

Plaintiffs here have not analyzed different states' consumer protection laws in their

motion for class certification, as they instead base their argument on the inapplicable

contractual choice of law provision.  The Court, however, found at least twenty-eight state

statutes (in addition to laws in Puerto Rico and Washington, D.C.) regulating credit repair

organizations or similar entities.[7]  Some of these statutes have different requirements than

---

[6]Seven nonexclusive general factors guide courts' choice of law analyses under the Restatement test: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in determination and application of the law to be applied. *E.g.*, *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403-04 (5th Cir. 2004) (citing RESTATEMENT (SECOND) CONFLICT OF LAWS, § 6(2)).

[7]Arizona, Arkansas, California, Colorado, Delaware, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, North Carolina, Ohio, Oklahoma, Pennsylvania, Puerto Rico, South Carolina, Texas, Utah, Washington, Washington, D.C., West Virginia, and Wisconsin all have statutes specifically regulating credit repair organizations (or similar entities).  *See* 111 AM. JUR.

TCSOA; for example, unlike Texas, Washington does not require credit service organizations to file a registration statement with the state prior to doing business there. *Compare* WASH. REV. CODE § 19.134 *with* TEX. FIN. CODE § 393.001, *et. seq.* Given that so many jurisdictions have laws governing credit repair organizations and that Plaintiffs have not shown why Texas law should apply over these other statutes, the Court declines to certify a nationwide class under TSCOA.[8]

The Court now turns to Plaintiffs' remaining claims – CSA's liability under CROA and TDMSA. The Rule 23(b) predominance requirement "requires the court to assess how the matter will be tried on the merits." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (internal citations omitted). The district court must identify "which issues will predominate, and then determin[e] whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quotation omitted). Disputed issues

_____

PROOF OF FACTS 3d 205, § 16 (2009).

[8]Even if Plaintiffs had provided a thorough choice-of-law analysis, the Court is unable to see a way to certify the nationwide class under any jurisdiction's specific credit services organization act absent a broad contractual provision. Though CSA is a Texas entity, Plaintiffs reside in different states; indeed two of the proposed class representatives do not reside in Texas – DiBartolomeo is a Massachusetts resident and the McDaniels are Washington residents. Pls.' First Am. Compl. ¶¶ 6-7, 9 [43]. Both the Texas Supreme Court and the Fifth Circuit have rejected the notion that "the state of the defendant's residence in the aggregate has a greater relationship to the putative class action than the state of any individual class member." *Gyarmathy*, 2003 WL 21339279, at *3. Further, though the Restatement (Second) does not directly address statutory choice of law analysis, query whether out-of-state plaintiffs with no connection to Texas could sue under Texas law. *See* Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification 30-32 [107-1] (arguing that the United States Constitution would not permit certification of a nationwide class based on Texas law).

predominate over undisputed issues and complex questions predominate over the more straightforward. *See id.* at 327; *Steering Comm. v. Exxon Mobil Corp.,* 461 F.3d 598, 603 (5th Cir. 2006).

Here, the Court finds that common issues of fact and law predominate over individual claims under CROA and TDMSA. Because CSA concedes that it has not complied with CROA[9] or TDMSA,[10] the predominant issues in this litigation are (1) whether CROA or TDMSA apply to CSA's business model and (2) what damages Plaintiffs and class members can recover, if any.

The short answer to whether common issues on liability predominate is that the Court is able to determine liability on a common basis as a matter of law. *See infra*, Part III. CSA argues that individual issues predominate because the applicability of CROA and TDMSA to CSA depends on whether the Plaintiffs and putative class and subclass members relied on, were exposed to, or were harmed by CSA's representations. However, courts determine CROA and TDMSA liability by analyzing an entity's representations and actions.[11] *See Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969, 974 (N.D. Ill. 2006) ("Whether a company is a credit repair organization under CROA depends on the representations made.");

---

[9]CSA admits that it accepted payment before rendering service and failed to provide clients with the requisite disclosure under CROA. *See* Def.'s First Am. Answer ¶¶ 72-73 [52].

[10]CSA admits that it has never registered as a debt management service provider under TDMSA. *See* Def.'s First Am. Answer ¶ 93.

[11]CSA acknowledges that "CROA, at least as Plaintiffs seek to apply it, is a strict liability statute." Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification 11.

TEX. FIN. CODE § 394.202(6)(B) (an entity is liable under TDMSA if it performs the actions listed in this section). Specifically, an entity must represent that it will improve "any consumer's credit record, credit history, or credit rating" for CROA to apply. 15 U.S.C. § 1679a(3).[12] Entities must assist consumers in arranging payments for TDMSA to apply. TEX. FIN. CODE § 394.202(6)(B). If an entity's representations and actions fall under the purview of CROA and TDMSA, it is strictly liable for statutory violations regardless whether an individual relied on, was exposed to, or was harmed by its representations or actions. *See Hillis v. Equifax Consumer Serv., Inc.*, 237 F.R.D. 491, 506 (N.D. Ga. 2002) ("CROA is a strict liability statute."); TEX. FIN. CODE §§ 394.293(a), (c) (TDMSA's expressed list of exceptions does not include lack of reliance, exposure, or harm). This Court therefore does not have to decide individual issues of reliance, exposure, or injury, but can determine CROA and TDMSA liability on a class-wide basis. Accordingly, common issues of fact and law predominate with regard to CSA's liability.

Though an individual issue, damages do not predominate over the common issue of liability with regard to Plaintiffs' CROA and TDMSA claims. "[T]he necessity of calculating damages on an individual basis will not necessarily preclude class certification."

---

[12]To be liable under CROA, an entity must also (1) use instruments of interstate commerce to sell, provide, or perform its service and (2) provide its service in exchange for valuable consideration. 15 U.S.C. § 1679a(3). There is no dispute that CSA meets these two requirements. The fact that CSA charged consumers for its services distinguishes it from the cases CSA cites to refute predominance. The courts in CSA's cases held defendants not liable under CROA because the defendants did not charge for their credit repair services, not because of the predominance of individual liability issues. *See Wojcik v. Courtesy Auto. Sales, Inc.*, 2002 WL 31663298, at *9 (D. Neb. 2002); *Oslan v. Collection Bureau of Hudson Valley*, 2001 WL 34355648, at *1 (E.D. Pa. 2001); *Sannes v. Jeff Wyler Chevrolet, Inc.*, 1999 WL 33313134, at *3 (S.D. Ohio 1999).

*Steering Comm.*, 461 F.3d at 602 (citation omitted).  In the Fifth Circuit, individual damages do not preclude the predominance of common issues if they are "capable of computation by means of objective standards" and do not "entail complex individualized determinations." *Allison*, 151 F.3d at 415.  The Plaintiffs and putative class members here seek refunds of the fees they paid to CSA.[13]  The Court can calculate damages simply by determining the amount each class member paid to CSA.  *See Helms v. ConsumerInfo.com, Inc.*, 236 F.R.D. 561, 567 (N.D. Ala. 2005) ("Whatever individual issues may exist as to damages, they are not complex enough to preclude class certification.").  Thus, individualized damages do not defeat predominance.  The Court, therefore, holds that common issues predominate over individual issues within Plaintiffs' CROA and TDMSA claims.

*2. Superiority.* – In order to certify a class, the district court must find that class action disposition of the proposed claims is superior to other forms of litigation.  The prototypical superior class action exists where there is a substantial wholesale injury but individual recovery is too slight and burdensome on the courts to support individual suits.  *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (Rule 23(b)(3) designed to address cases where individual loss is small and hard to quantify).  This case precisely fits that profile.  The interest of putative class members in pursuing their own claims here is small because of the relatively slight damages each member suffered under CROA and TDMSA.

---

[13]Credit repair organizations that violate CROA are liable for "any amount paid by the person to the credit repair organization."  15 U.S.C. § 1679g(a)(1)(B).  Under TDMSA, "[a] consumer is entitled to recover all fees paid by the consumer under a void agreement, costs, and reasonable attorney's fees."  TEX. FIN. CODE § 394.215(b).

Plaintiffs and class members seek refunds of the fees they paid CSA. This potential damage award probably would not justify individual litigation for most of the named Plaintiffs or potential class members. In the aggregate, however, the collective damages justify the effort of class litigation.

CSA attempts to turn this argument on its head, arguing that class damages are so large that a class action is somehow not superior. CSA asserts that class certification subjects it to potential liability that grossly outweighs the alleged harm it caused. When considering superiority of a class action as it relates to large damage awards, courts consider the specific statute at issue. *See* 2 WILLIAM B. RUBENSTEIN, ALBA CONTE, & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 5.56 (4th ed. 2002) (noting that the circuit courts that have addressed the issue usually consider the individual statute at issue when determining whether large damage awards fail Rule 23(b)'s superiority requirement). Though the Court understands that class certification here could lead to a potentially large damage award against CSA, the statutes at issue expressly and implicitly authorize that outcome. Congress contemplated class actions and limited class-wide punitive damages under CROA. *See* 15 U.S.C. § 1679g(a)(2)(B).[14] Congress has not, however, chosen to include in CROA's class action provision a cap for class actual damage awards. *Compare* 15 U.S.C. § 1679g(a)(1) (no statutory cap for class-action actual damages for CROA violations) *with* 15 U.S.C. § 1640(a)(2)(B) (statutory cap for class-action damages for Truth in Lending Act ("TILA")

---

[14]CROA creates strict liability for violations and allows minimum damage awards equal to the amount Plaintiffs and putative class members paid CSA. *See* 15 U.S.C. § 1679g(a)(1).

violations); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1114 (5th Cir. 1978), *aff'd*, 445 U.S. 326 (1980) (holding that Congress explicitly protected TILA violators from ruinous suits, but when Congress has not explicitly limited liability, there is no evidence that it wanted to protect violators from ruinous suits); 15 U.S.C. § 1692k(a)(2)(B) (statutory cap for class-action damages for violations of the Federal Debt Collections Practices Act ("FDCPA")); *Murray*, 434 F.3d 954 (noting FDCPA's damage cap).[15]  Similarly, though the Texas legislature has not addressed class actions or class-action damages with regard to the civil remedies available under TDMSA, neither has it limited them.[16]  *See* TEX. FIN. CODE § 394.215.  For the Court to deny certification because damages are too big would amount to this Court purporting to overrule Congress's policy determination (no cap on class actual damages) with its own (class damages are too big).  This would overstep the authority that Article III grants courts.

Moreover, class treatment tends to be appropriate when a statute's damage provision serves primarily deterrent or compensatory goals, though it may not to be appropriate if the statutory damage provision serves punitive goals.  *See* RUBENSTEIN, CONTE, & NEWBERG, *supra*, at § 5.56.  In this case, Plaintiffs' simply seek a refund of the fees they paid to CSA

---

[15]The TILA cases CSA cites are therefore distinguishable.  *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003); *Wilcox v. Commerce Bank of Kan. City*, 474 F.2d 336 (10th Cir. 1973); *Ratner v. Chem. Bank NY Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972). Similarly, the Sherman and Clayton Act case that CSA cites is distinguishable for the same reason: it involves different statutes than the ones at issue here.  *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974).

[16]In the context of federal statutes, courts should presume that class actions are available unless Congress expresses a contrary intent.  *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979).

under CROA. In other words, Plaintiffs' wish to be restored to the position they were in before signing a contract with CSA – to force CSA to disgorge the revenue it obtained in violation of CROA. This remedy fits within the category of serving deterrent or compensatory goals, rather than serving a punitive goal. If the aggregate damages turn out to be large, as CSA fears, it would merely demonstrate the magnitude of CSA's wrongful conduct rather than a disproportionate punishment. *See Murray*, 434 F.3d at 953-54 (the potential for substantial statutory damages is not an abuse of Rule 23(b), but the consequence of a legislative act intended to remedy defendant's statutory violation).

Accordingly, Defendants argument regarding disproportionate damages is without merit under CROA and TDMSA.[17] *See* RUBENSTEIN, CONTE, & NEWBERG, *supra*, at § 5.56 (courts have observed that harsh damage results arise from substantive statutes rather than deficiencies in the class action mechanism). The potential for substantial damages here is simply a result of the interaction between the statutes and Rule 23, neither of which the Court may ignore or amend. The Court, therefore, finds that a class action is superior to adjudicating Plaintiffs' CROA and TDMSA claims on an individual basis.[18]

---

[17]In addition, the Court does not see how individual lawsuits would lessen the damage liability for CSA because CSA, under either statute, may have to pay separate attorneys' fees for each litigant. Such individual cases would also overwhelm and negatively impact the efficiency of the court, the very thing the class action mechanism seeks to prevent. The only way requiring individual lawsuits would lessen CSA's liability is if individual plaintiffs did not bother to sue because of the expense and inconvenience – the very consequence Rule 23 aims to prevent. *See Murray*, 434 F.3d at 953.

[18]CROA cases that CSA cites to the contrary are not binding on this Court, and the Court finds them unpersuasive. *See Hillis*, 237 F.R.D. 491 (no superiority in proposed CROA class action because damages would be disproportionate to the culpability of the defendant; court found insignificant the fact that Congress did not explicitly limit violators'

ORDER – PAGE 20

### C. Rule 23(a) Requirements

Neither party disputes that the proposed class has sufficient numerosity and commonality. However, CSA alleges that the proposed class representatives are not typical or adequate.[19] Because the Court found Plaintiffs' claims under TCSOA did not meet Rule 23(b)'s predominance requirement, it only considers Plaintiffs' CROA and TDMSA claims under Rule 23(a).

---

liability under CROA); *Helms*, 236 F.R.D. 561 (no superiority in proposed CROA class action because sophisticated plaintiff was not the type of individual that consumer protection statutes were designed to protect and damages would be disproportionate to the defendant's culpability); *Dilley v. Acad. Credit, LLC.*, 2008 WL 4527053 (D. Utah Sept. 29, 2008) (no superiority in proposed CROA class action because damages would be disproportionate to the harm where plaintiff's misrepresentation claim was "questionable" and he suffered "little, if any, damages").

The cases all rely on *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004), for the proposition that a court should deny class certification if statutory strict liability damages are potentially enormous and out of proportion to any harm or culpability. However, neither the Fifth Circuit nor any district court within the Fifth Circuit has ever cited *Klay* for that proposition. And the Seventh and Ninth Circuits have rejected the same argument in determining the superiority of a class, albeit under the Fair Credit Reporting Act ("FCRA") and the Fair and Accurate Credit Transactions Act ("FACTA"). *See Murray*, 434 F.3d at 953-54 (FCRA); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010) (FACTA) (reversing district court's denial of class certification based on the fact that plaintiff's violation of FACTA would subject it to "disproportional" damages and that therefore a class action was not a superior means of adjudication and holding (1) that Rule 23 does not permit a court to consider whether defendant's liability would be out of proportion to any harm plaintiff suffered and (2) that magnitude of damages is not necessarily a reason to deny class certification). This Court similarly does not find a disproportionate damages inquiry relevant to CROA class certification where Congress has not capped class-action damages in the statute – as it has in the TILA context.

[19]Rebecca Lamb, a plaintiff in a parallel litigation, *Lamb v. Credit Solutions of America*, also challenges the typicality and adequacy of Plaintiffs' proposed class representatives. Lamb fears that class certification could waive class members' ability to arbitrate. Lamb's Amicus Curiae Br. 9 [108]. Lamb's concern is unfounded. Putative class members who prefer to arbitrate may opt out of the class litigation. FED. R. CIV. P. 23(c)(2)(B)(v).

*1. Typicality*. – Plaintiffs' claims must be typical of the proposed class' and subclass' claims. "The test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC.* 186 F.3d 620, 625 (5th Cir. 1999). The Fifth Circuit has counseled:

> Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

*James v. City of Dallas, Tex.,* 254 F.3d 551, 571 (5th Cir. 2001) (quotation and citation omitted). In the present case, all the claims arise from CSA's liability under CROA and TDMSA, so the Plaintiffs, putative class', and putative subclass' claims have the same essential characteristics. The Plaintiffs, putative class members, and putative subclass members also seek the same remedies under these statutes. *See* Pls.' Mot. for Class Certification 13-14. Accordingly, typicality exists because the asserted claims and remedies are identical.

CSA argues that two named Plaintiffs have atypical claims. CSA first argues that Jessica McDaniel's claims are atypical because she signed a release that excused CSA from causes of action based upon strict liability, among other things. Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification 6. CSA explains that the release gives it a unique defense against McDaniel's suit and that no other putative class claim is similarly encumbered. *Id.* However, typicality fails only if a class representative has to spend significant time rebutting the unique defense to the extent that the individual defense becomes the focus of the litigation. *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007); *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 205 (N.D. Tex. 1997) (Kaplan, Mag. J.).

The release in this case does not defeat typicality.[20]   There is no evidence that McDaniel's rebuttal of the release defense will take a significant amount of time or distract her from pursuing the class action.   As the Court's summary judgment analysis below reflects, disposition of the release issue is not complex or difficult.   Therefore, McDaniel's signed release does not defeat typicality.[21]

CSA next claims that DiBartolomeo's claim is not typical because she did not seek out CSA to *repair* her credit, but only to *maintain* her credit.   Def.'s Br. in Opp'n to Pls.' Mot. for Class Certification 7.   But this argument has no relevance to her claim's typicality. DiBartolomeo's claim, like the other Plaintiffs' and the putative class', is based on CSA's liability under CROA.   CROA does not require a plaintiff to seek out an entity's credit repair services.   *Cf. Zimmerman v. Puccio*, 613 F.3d 60, 71-72  (1st Cir. 2010) (holding that CROA can apply to defendant's forward looking statements regarding plaintiff's credit in addition to statements regarding repairing past credit problems).   CSA acknowledges that CROA is a strict liability statute.   Def.'s Opp'n & Cross Mot. for Summ. J. 14.   Because reliance is not an element in a CROA claim, DiBartolomeo's subjective intent in retaining CSA does not defeat typicality, and her claim is typical even though she did not seek to repair her credit.

_____

[20]CSA alleges that McDaniel's husband's claim is also atypical because the release is community property.  The Court need not discuss the merits of this argument because it finds that the release does not defeat typicality.

[21]Even if the release terminated McDaniel's claims, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991) (quotation omitted).

Accordingly, the Court finds that the putative class representatives' claims are typical of the class.

**2. Adequacy.** – CSA's only adequacy argument is that Reynolds has no standing because his claims belong to his bankruptcy trustee. However, Reynolds's trustee has abandoned the claims against CSA. Pls.' App. to Pls.' Reply 52 [99-2]. Due to the trustee's abandonment, the claim is no longer a part of the bankruptcy estate and Reynolds has standing to pursue the claim. *See In re Carter Paper Co.*, 220 B.R. 276, 299-300 (M.D. La. 1998). Therefore, the Court finds that Reynolds is an adequate class representative.

### D. Conclusion on Class Certification

Plaintiffs seek certification of a class containing "all persons in the United States who signed a services contract with Credit Solutions and made at least one monthly fee payment to Credit Solutions pursuant to that agreement" based on CSA's alleged CROA and TCSOA violations. Plaintiffs also move to certify a subclass consisting of "all persons who, at any time from September 1, 2005, to the present, and while a Texas resident, signed a services contract with Credit Solutions and made at least one monthly fee payment to Credit Solutions pursuant to that agreement" based on CSA's alleged violation of TDMSA.

Though Plaintiffs' TCSOA claim fails the predominance test under this Court's choice of law analysis, there is little subjectivity relating to individual claims under CROA and TDMSA, so the proposed class and subclass meet Rule 23's predominance test with regard to those causes of action. Unlike TILA, CROA and TDMSA do not limit the potential liability of offenders, and thus the proposed class meets Rule 23's superiority requirement

with regard to Plaintiffs' CROA and TDMSA claims.  Finally, McDaniel's release and DiBartolomeo's lack of reliance do not defeat typicality for Plaintiffs' CROA claim under Rule 23's typicality test, and Reynolds has standing under Rule 23's adequacy requirement to represent the putative class and subclass.

Therefore, the Court (1) denies class certification for Plaintiffs' TCSOA claim, (2) certifies the proposed class with regard to Plaintiffs' CROA claim, and (3) certifies the TDMSA subclass using Plaintiffs' proposed definitions.

### III. SUMMARY JUDGMENT MOTIONS

In the summary judgment motions, the parties dispute whether (1) CSA is subject to CROA; (2) CSA is subject to TCSOA; (3) TDMSA applies to CSA; (4) the McDaniels' claim should be dismissed; and (5) Reynolds has standing.  The Court considers each of these issues in succession.

### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, courts need not sift through the record in search of triable issues.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 847 (5th Cir. 1983) ("Judges are not ferrets!").

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In doing so, the nonmovant may not rely on "naked assertions of an actual dispute" but instead "must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *In re Lewisville Props., Inc.*, 849 F.2d 946, 950 (5th Cir. 1988) (citing *Anderson*, 477 U.S. at 255–56). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

### B. CSA Is a Credit Repair Organization Under CROA

The dispute between the parties centers on whether CSA is a "credit repair organization" under CROA. CSA argues that Congress intended the term "credit repair organization" to encompass only those organizations that claim they can repair a customer's past or existing credit record, history, or rating. Plaintiffs, on the other hand, argue that the term includes all entities that represent that their services will improve credit, including those that offer prospective advice intended to improve a consumer's ability to obtain and manage credit in the future.

Although this is an issue of first impression in this Circuit, the Court is not writing on a clean slate. Various courts across the nation have considered the scope of the term "credit

repair organization" under CROA and have reached different conclusions. *Compare Zimmerman v. Puccio*, 613 F.3d 60, 75-76 (1st Cir. 2010) (debt management service was a "credit repair organization" under CROA); *Rannis v. Recchia*, 380 Fed. App'x 646, 649-650 (9th Cir. 2010) (attorney's office that provided credit "resolution" services was a "credit repair organization" under CROA); *FTC v. Gill*, 265 F.3d 944, 952-56 (9th Cir. 2001) (attorney's office that provided credit repair services was a "credit repair organization" under CROA); *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 404 (E.D. Pa. 2006) (plaintiffs stated a claim under CROA against a debt management service); *Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1232-34 (N.D. Al. 2005) (credit monitoring service was a "credit repair organization" under CROA); *Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539, 547 (D. Md. 2005) (credit counseling agency was a "credit repair organization" under CROA); *Limpert v. Cambridge Credit Counseling Corp.*, 328 F. Supp. 2d 360, 364-65 (E.D.N.Y. 2004) (plaintiffs stated a claim under CROA against a debt management service, noting that "there is a fine line . . . between promising future rewards for creditworthiness, and implying that existing bad credit records may be prematurely expunged.") *with Lopez v. ML #3, LLC*, 607 F. Supp. 2d 1310, 1312 (N.D. Fla. 2009) (car dealership that overstated a prospective buyer's income was not a "credit repair organization" under CROA); *Cortese v. Edge Solutions, Inc.*, 2007 WL 2782750, at *5-7 (E.D.N.Y. 2007) (debt management plan was not a "credit repair organization," but a program intended to rehabilitate credit ratings was a "credit repair organization" under CROA); *Hillis*, v. *Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 512-14 (N.D. Ga. 2006) (credit restoration service that offered prospective advice was not a "credit repair

organization" under CROA); *Plattner v. Edge Solutions, Inc.*, 422 F. Supp. 2d 969, 974-75 (N.D. Ill. 2006) (debt management plan that included a program intended to rehabilitate credit ratings was not a "credit repair organization" under CROA). The question facing the Court thus is a difficult – and close – one.

       *1. Principles of Statutory Interpretation. –* When interpreting a federal statute, courts begin by examining its language. *In re Nowlin*, 576 F.3d 258, 261 (5th Cir. 2009) (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004)). If the language of the statute is plain, the Court must enforce the statute's plain meaning unless doing so would lead to an absurd result. *Id.* at 262-63. Courts look to the statutory language "as well as the design, object and policy in determining the plain meaning of a statute." *United States v. Ridgeway*, 489 F.3d 732, 734 (5th Cir. 2007) (citing *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995)). If, however, the statute is ambiguous, in that it is "susceptible to more than one reasonable interpretation or more than one accepted meaning," the Court may turn to its legislative history. *United States v. Valle*, 538 F.3d 341, 345 (5th Cir. 2008) (quoting *U.S. v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the that language is used, and the broader context of the statute as a whole." *United States v. Guidry*, 456 F.3d 493, 502 (5th Cir. 2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

       *2. CROA Applies to CSA.* – In general, CROA is designed to protect consumers from fraud and abuses caused by credit repair organizations. *See* 15 U.S.C. § 1679(b); *Cortese*,

2007 WL 2782750, at *4.  Congress codified its findings and purposes when it enacted the

statute.  The findings state:

> (1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit.  As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

> (2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

15 U.S.C. § 1679(a). The purposes of CROA are:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

With these Congressional findings and purposes in mind, the Court turns to the

definition of "credit repair organization" provided in the statute.  Under the CROA, a "credit

repair organization" is:

> (A) . . . any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or valuable consideration, for the express or implied purpose of –

> (i) improving any consumer's credit record, credit history, or credit rating; or

> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).  . . .

15 U.S.C. § 1679a(3). This definition is "extremely broad." *Plattner*, 422 F. Supp. 2d at 972.

CSA argues that it is not a credit repair organization subject to the CROA, claiming there is a distinction between prospective credit advice, which "endeavors to gradually improve clients' credit by encouraging creditworthy behavior going forward," and "forms of credit repair in which clients are given false hopes of absolution for confessed past credit sins." *Limpert*, 328 F. Supp. 2d at 364; *see Hillis*, 237 F.R.D. at 512-14; *Plattner*, 422 F. Supp. 2d at 974-75. CSA argues that CROA applies to the latter category, but not to the former.[22]

However, the First Circuit recently considered and rejected the argument that the definition of "credit repair organization" incorporates the distinction that CSA advances:

> The distinction drawn by the *Hillis* court, and embraced by the defendants, is unsupportable. By its plain terms, CROA applies to organizations that provide, in exchange for consideration, "any service" for the "express or implied purpose" of improving a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3)(A). The language of the Act does not bind the concept of an improved credit record, credit history, or credit rating to the literal alteration ("repair") of an historical record, history, or rating. As the district court explained, "[t]he ostensibly forward-looking orientation" of

_____

[22]A Northern District of Georgia court explored this distinction extensively. *Hillis*, 237 F.R.D. 491. It held that: "The statute's omission of a definition for the terms 'credit record,' 'credit history,' or 'credit rating,' along with the statute's sweeping language and its inclusion of different credit terms in another section of the statute, creates an ambiguity in the statute . . . ." *Id.* at 512. Because the *Hillis* court found CROA ambiguous, it looked to legislative history. *Hillis* concluded that the legislative history supported a narrower definition of a 'credit repair organization' "than a cursory reading of the [CROA] would indicate." *Id*. at 514. This Court sees no need to ignore the plain, albeit expansive, language of CROA and look to legislative history. *See Nowlin*, 576 F.3d at 262-63 (plain-language requirement).

representations about improving clients' credit "does not mitigate the obvious message to debtors that [those] services might modify the effect of their past credit history on their credit score." Credit records are constantly changing based on the ongoing performance of the consumer. By improving credit behavior prospectively, a consumer aims to improve a pre-existing credit record, credit history, and/or credit rating with a more favorable record, history, or rating in the future. Thus, credit counseling aimed at improving future creditworthy behavior is the quintessential credit repair service.

*Zimmerman*, 613 F.3d at 71-72 (internal citations omitted). While CSA does not represent that its program would change or repair a client's existing credit record, history, or rating, its website has made several representations about its program's positive effects on credit.

Our debt-relief service also eases your way out of bad credit, . . . homebuyers can use our service to improve their bad credit score, . . . Our service eliminates bad credit.

Pls.' App. at 55, 87-120 [80]. Credit repair organizations utilize instruments of interstate commerce to propagate claims that they can improve consumer credit for valuable consideration. CSA does not deny that it represented that it would improve clients' credit ratings. It also does not dispute that it employed the internet, mail system, and phone lines to sell its services for money. CSA therefore meets the definition of a credit repair organization and is subject to CROA.[23]

---

[23]The defendants in some cases supporting narrow CROA interpretation are distinguishable from CSA. The *Plattner* court held that Edge Solutions' Debt Melt Down Program was not subject to CROA because it did not represent or imply that the program was "designed to improve the participant's credit." *Plattner*, 422 F. Supp. 2d at 974. In *Jackson v. Telegraph Chrysler Jeep, Inc.*, the court held that CROA was not applicable to defendant because there was no evidence that it represented that it would improve or repair credit. 2009 WL 928224, * 6 (E.D. Mich. 2009) ("The Plaintiffs have not offered any evidence which suggest that the Defendants (1) held themselves out as a credit repair agency, (2) offered to 'repair' bad credit after the fact, or (3) 'crossed the boundary from credit counseling to credit repair'"). CSA, however, did expressly represent that its services would improve participant's credit.

**3. CSA Violated CROA.** – CROA mandates the following:

> No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

15 U.S.C. § 1679b(b)

> Any credit repair organization shall provide any consumer with [a] written statement [entitled "Consumer Credit File Rights Under State and Federal Law"] before any contract or agreement between the consumer and the credit repair organization is executed . . . .

15 U.S.C. § 1679c(a)

> [Contracts must include, in writing,] a full and detailed description of the services to be performed by the credit repair organization for the consumer, including an estimate of the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete . . . .

15 U.S.C. 1679d(b)(2). CSA admits that it accepted payment before rendering service, *see* Def.'s First Am. Answer ¶ 72, failed to provide clients with the requisite disclosure, *see id.* at ¶ 73, and it has not identified a disputed fact issue with regard to Plaintiffs' claim that it entered agreements without specifically explaining the scope and timeline of its services,[24] all of which violate the CROA, *see* 15 U.S.C. § 1679d(b)(2). Therefore, the Court grants Plaintiffs motion for summary judgment on its CROA claim.

---

[24]Though CSA denies that it entered into agreements without specifically explaining the scope or timeline of its services, *see* Def.'s First Am. Answer ¶¶ 23, 74, CSA focuses solely on whether it is a "credit services organization" under CROA in its Opposition to Plaintiffs' Partial Motion for Summary Judgment and Cross-Motion for Summary Judgment. *See* Def.'s Opp'n & Cross Mot. for Summ. J. 10-43. The Court notes, again, that courts need not sift through the record in search of triable issues in analyzing a motion for summary judgment, *Adams*, 465 F.3d at 164, and that "[j]udges are not ferrets," *Nicholas Acoustics & Specialty Co.*, 695 F.2d at 847.

ORDER – PAGE 32

### C. CSA Is a Credit Service Organization Under TCSOA

**1. TSCOA Applies to CSA.** – TCSOA defines a credit services organization as:

> a person who provides, or represents that the person can or will provide, for the payment of valuable consideration any of the following services with respect to the extension of consumer credit by others: (A) improving a consumer's credit history or rating . . . .

TEX. FIN. CODE § 393.001(1).  CSA claims that it is not a credit service organization simply because it "represents that it provides advice or assistance to a consumer to improve a consumer's credit history or rating."  Def.'s Opp'n & Cross Mot. for Summ. J. 44.  Rather, CSA asserts, an entity is a credit services organization only if it represents that it can improve credit ratings in conjunction with an extension of consumer credit[25] which CSA does not do.

However, CSA has represented that it could improve credit ratings in conjunction with an extension of consumer credit:

> First of all you won't be making [credit card] payments each month, which will hurt your credit at first . . . let's say we pay off your first card 8 months into the program.  Well, that card will stop negatively affecting you 6 months later, BUT it will positively affect you immediately because you debt to income ratio will improve. . . . We are fixing the most important part of your credit.  So, to make this simpler, in the first year your credit will go down, but in the 2nd year it will get better and by the time you're done with the program, it will be better than it is now.

Pls.' App. at 55 [80].  CSA specifically encourages clients to defer payments of personal, family, and household debt when it explained that clients would not make credit card payments each month.  CSA then assures customers that deferred payments were a means of improving "the most important part of their credit."  Even by its own description of its

---

[25]Extension of consumer credit is "the right to defer payment of debt offered or granted primarily for personal, family, or household purposes or to incur the debt and defer its payment."  TEX. FIN. CODE § 393.001(4).

methods, CSA falls within the plain statutory language definition of a "credit services organization." The Court, therefore, holds that CSA is a credit service organization subject to TCSOA.

*2. CSA Violated TCSOA.* – TCSOA provides that:

a credit services organization shall provide the consumer with a document containing: (1) a complete and detailed description of the services to be performed by the organization for the consumer and the total cost of those services; (2) an explanation of the consumer's right to proceed against the surety bond or account obtained under Section 393.302; (3) the name and address of the surety company that issued the surety bond or the name and address of the depository and the trustee and the account number of the surety account, as appropriate . . . .

Tex. Fin. Code § 393.105(1-3)

[A] contract [between a credit service organization] must . . . fully describe the services the organization is to perform for the consumer, including each guarantee and each promise of a full or partial refund and the estimated period for performing the services, not to exceed 180 days . . . .

Tex. Fin. Code § 393.201(b)(2)

A credit services organization or a representative of the organization may not charge or receive from a consumer valuable consideration solely for referring the consumer to a retail seller who will or may extend to the consumer credit that is substantially the same as that available to the public.

Tex. Fin. Code § 393.303

A credit services organization or a representative of the organization may not make or use a false or misleading representation in the offer or sale of the services of the organization . . . guaranteeing an extension of consumer credit regardless of the person's credit history unless the representation clearly discloses the eligibility requirements for obtaining the extension . . . .

Tex. Fin. Code § 393.304(1)(B). CSA admittedly did not comply with these TCSOA requirements. *See* Def.'s First Am. Answer ¶¶ 78-80.

ORDER – PAGE 34

Despite its admission, CSA argues that Plaintiffs are not entitled to recover statutory damages because they cannot prove they were harmed by CSA's TCSOA violations. But Plaintiffs do not need to prove they were injured to receive a refund under TCSOA. *See In re Zuniga*, 332 B.R. 760 (Bankr. S.D. Tex. 2005) (court did not inquire whether plaintiff was harmed by TCSOA violations); *see also Maverick Recording Co. v. Harper*, 598 F.3d 193, 197-99 (5th Cir. 2010) (court did not engage in a causation analysis because plaintiff sought only minimum statutory damages under copyright act). In this case, Plaintiffs simply want CSA to refund their fees. "A consumer injured by a [TCSOA] violation . . . is entitled to recover actual damages in an amount not less than the amount the consumer paid the credit services organization." TEX. FIN. CODE § 393.503(a)(1).[26] The Court therefore grants Plaintiffs summary judgment on their TCSOA claim.

### D. TDMSA Does Not Apply to CSA

As it existed at the time Plaintiffs commenced this suit,[27] TDMSA defined "debt management service" as "arranging or assisting a consumer to arrange for the distribution of one or more payments to or among one or more creditors of the consumer in full or partial payment of the consumer's obligations." TEX. FIN. CODE § 394.202(6)(B). CSA admits that it helps customers by negotiating with their creditors to reduce their debt. *See* Def.'s Opp'n & Cross Mot. for Summ. J. 49. However, CSA argues that it does not control its clients'

---

[26]Even if TCSOA required proof of causation, Plaintiffs are still entitled to a refund under the strict liability CROA provision. *See* 15 U.S.C. § 1679g(a)(1)(B).

[27]After the parties' briefing, the 82nd Texas legislature enacted, and the governor signed, Senate Bill (SB) 141, effective September 1, 2011. However, unless otherwise noted, all citations in this Order are to TDMSA as it existed before September 1, 2011.

funds, and it "does not assist or arrange the distribution of any payment, but instead endeavors to ensure that the total debt is less than what the customer originally owed." *Id.* Therefore, CSA argues, it is not a "debt settlement service" subject to the TDMSA.

CSA points to the Finance Commission of Texas' implementing regulations to support its position.[28] These regulations provide that TDMSA applies to "a debt management service provider who is engaged in the business of receiving funds from or controlling the funds of consumers for the purpose of distributing those funds to the creditors of consumers." 7 TAC § 88.109(a). Thus, TDMSA does not apply to "business relationships or agreements that purport to assist consumers with their debts to the extent that consumer funds are not deposited into an account under the control of the person or business entity who is assisting the consumers with their debts." 7 TAC § 88.109(b)(3). Plaintiffs do not dispute that, under these regulations, TDMSA would not govern CSA. *See* Pls.' Reply 30. Rather, they argue that the Finance Commission's regulations contradict the plain language of TDMSA and are therefore invalid. *Id.* Thus, the question before the Court is whether the Finance Commission's construction of "debt management service" under TDMSA – the statute it is charged with administering, *see* TEX. FIN. CODE § 394.214 – is valid.

***1. Texas Principles of Statutory and Regulatory Interpretation.*** – Texas courts review statutory construction questions de novo. *RR Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). An agency's "interpretation of a statute it is charged with administering is entitled to 'serious consideration,' so long as

---

[28]As with SB 141, the Court applies the Finance Commission's regulations in place at the time Plaintiffs filed this suit.

the construction is reasonable and does not conflict with the statute's language . . . ." *Id.*  A

court "should grant an administrative agency's interpretation of a statute it is charged with

enforcing some deference." *Id.*  According to the Texas Supreme Court, several

considerations "temper" this deference:

> First, [the deference] applies to formal opinions adopted after formal
> proceedings, not isolated comments during a hearing or opinions in a court
> brief.  Second, the language at issue must be ambiguous; an agency's opinion
> cannot change plain language.  Third, the agency's construction must be
> reasonable; alternative, unreasonable constructions do not make a policy
> ambiguous.

*Id.* (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)).

> **2. TDMSA Does Not Apply to CSA.** – The first consideration tempering this Court's

deference does not apply in this case, so the Court first analyzes whether TDMSA is

ambiguous and then whether the Finance Commission's interpretation of TDMSA is

reasonable.  TDMSA provides:

> "Debt management service" means:
>
> > (A) the receiving of money from a consumer for the purpose of
> > distributing that money to or among one or more of the creditors of the
> > consumer in full or partial payment of the consumer's obligations;
> >
> > (B) arranging or assisting a consumer to arrange for the distribution of
> > one or more payments to or among one or more creditors of the
> > consumer in full or partial payment of the consumer's obligations; or
> >
> > (C) exercising control, directly or indirectly, or arranging for the
> > exercise of control over funds of a consumer for the purpose of
> > distributing payments to or among one or more creditors of the
> > consumer in full or partial payment of the consumer's obligations.

TEX. FIN. CODE § 394.202(6).  The phrase "arranging . . . for the distribution" in subsection

(B) is undefined.  However, it is clear that the phrase is ambiguous – that is, it is subject to

multiple understandings.  For example, in this narrow case alone, Plaintiffs read the statute as covering debt settlement providers, like CSA, who arrange payments to creditors for consumers, while the Finance Commission and CSA read the statute as applying only to entities which physically control and distribute money on behalf of consumers.  Here, the Court need not consider "whether the Commission's construction is the only – or the best – interpretation in order to warrant [] deference" because an agency's interpretation need only be "reasonable and in accord with the statute's plain language."  *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 628.  Indeed, "[i]t is precisely when a statutory term is subject to multiple understandings that [courts] should defer to an agency's reasonable interpretation."  *Id.*

Finding the statute ambiguous, the Court considers whether the Finance Commission's interpretation is reasonable under the statute's plain language.  In determining the meaning of ambiguous terms, courts "read statutes as a whole and interpret it to give effect to every part." *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 628 (citations omitted). In the TDMSA, the descriptions of "distributions" in subsections (A) and (C) in section 394.202(6) surround the phrase "arranging . . . for the distribution" in subsection (B).  In subsections (A) and (C), distributions are explicitly tied to directly receiving or controlling consumers' money and distributing it to creditors.  Thus, it is reasonable for the Finance Commission to construe the phrase "arranging for the distribution" in subsection (B) in

harmony with the surrounding subsections and apply TDMSA only to "debt settlement service" companies that directly control consumers' funds.[29]

Accordingly, the Court finds the Finance Commission's interpretation of TDMSA reasonable and within the statute's plain meaning. Thus, the Court finds that CSA is not a "debt settlement service" under the statute. Because CSA is not subject to the TDMSA,[30] the Court grants CSA summary judgment for Plaintiff Reynolds's TDMSA claim on behalf of the Texas subclass, and it denies Plaintiffs' summary judgment for the same reasons.

_____

[29]The Court notes that "governmental agencies have a unique understanding of the statutes they administer." *Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 629 (citing *Wyeth v. Levine*, 555 U.S. 555, 577 (2009)).

[30]SB 141 and the Finance Commission's subsequent regulations bolster the Court's interpretation of "debt settlement service" under the TDMSA. The amended TDMSA broadens the definition of a "debt management service," defining it now as "a service in which a provider obtains or seeks to obtain a concession from one or more creditors on behalf of a consumer." TEX. FIN. CODE § 394.202(6) (2011) (amending TEX. FIN. CODE § 394.202(6) (2005)). The Texas Legislature's statement of intent of TDMSA amendment states:

> In 2005 and 2007, legislation was passed placing nonprofit and for-profit debt management services (including consumer credit counseling services and debt management companies) under the regulatory authority of the Office of Consumer Credit Commissioner. However, there is not a regulatory structure for similar services offered by debt settlement providers.
>
> Due to federal bankruptcy reform legislation passed in 2005, as well as the current economic downturn, a more uniform approach to the regulation of all providers of debt management services is timely. There is a need for consistency in the regulation of all providers of debt management services to provide protection for consumers.

S.B. 141, 2011 Leg., 82d Sess. (Tex. 2011) (Author's/Sponsor's Statement of Intent). The Finance Commission adopted amendments to its regulations, effective September 8, 2011, after receiving no written comments on the proposal. Notes, 7 TAC § 88.102 (effective Sept. 8, 2011). The Commission deleted 7 TAC § 88.109(b)(3) (discussed above). It noted, "[w]ith SB 141 [above], the legislature has broadened the scope of Texas Finance Code, Chapter 394, Subchapter C, Consumer Debt Management Services, to include debt settlement services."

### E. McDaniel's Release Does Not Bar Her Claim

CSA moves for summary judgment on McDaniel's claims because she signed a release of all claims against CSA. However, McDaniel's release related to only an overdraft fee and does not cover her current claims. CSA withdrew McDaniel's monthly payment prematurely. As a result, McDaniel incurred an overdraft fee. In response to McDaniel's complaint, CSA paid for the overdraft fee and sent her a broad release which stated:

> I understand this represents the final resolution of any and all claims I might have against Credit Solutions . . . based on any conduct that occurred before the date of this release.

Pls.' Reply at 7.

### 1. CSA Limited McDaniel's Release.

– McDaniel claims that CSA informed her that the release was limited to the overdraft transaction. CSA does not dispute that it made such a representation, but instead argues that its own prior representations and subsequent actions should not affect the literal, and unambiguously broad, language of the release.[31] CSA argues that its representation is inadmissible parole evidence that cannot vitiate the plain broad language of the release.

"The contract's language is to be given its plain grammatical meaning unless doing so would defeat the parties' intent." *Garza v. Bunting*, 2007 WL 1545937, at *5 (Tex. App. – Dallas May 30, 2007, no pet.) (citing *Stafford v. Allstate Life Ins. Co.*, 175 S.W.3d 537, 541 (Tex. App. – Texarkana 2005, no pet.)). Although courts generally afford contracts their plain meaning, doing so here would defeat the parties' intent. Parties are not allowed to

---

[31] The Court notes the inconsistency in CSA's argument given its position against the literal interpretation of CROA.

represent to another party that a release is limited and then demand that the court enforce the release broadly.  Based on CSA's prior representations, it is clear that McDaniels intended to release CSA from liability on claims related only to her overdraft fee.[32]

**2. McDaniel Relied on CSA's Representation.** – The doctrine of quasi-estoppel prevents a party from enforcing the broad interpretation of a release after it represented that it was limited in scope.  "Under Texas law, quasi-estoppel 'precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken.'"  *Hartford Fire Ins. Co. v. City of Mont Belvieu, Tex.*, 611 F.3d 289, 298 (5th Cir. 2010) (citation omitted); *see also Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) ("Estoppel . . . generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit.") (citations omitted).  CSA argues that estoppel does not apply because McDaniel did not articulate any conduct she took in reliance on her belief that CSA would not enforce the release as written.  This argument ignores the fact that McDaniel signed the release in reliance on CSA's representation.  CSA's argument that the court should simply disregard the representations it made to McDaniel defies any sense of fairness and justice.  The Court therefore holds that the release does not bar the McDaniels' present claims.[33]

---

[32]The cases upon which CSA relies for its position are distinguishable from the facts here because no party in those cases assured the other party that the release was limited prior to signing.  *See Stafford*, 175 S.W.3d 537 (court interpreted release broadly, but plaintiff never alleged that defendant represented that release was narrow in scope or offered to settle); *Garza*, 2007 WL 1545937 (defendants did not represent that release was limited).

[33] The Court need not address the issues of whether the release constitutes an improper waiver of CROA protection or whether community property obligates the release of McDaniel's husband's claims because it holds that McDaniel's release was limited only to

### *F. Reynolds Has Standing*

Finally, CSA argues that Reynolds does not have the right to maintain his current claims because he filed for bankruptcy after he filed his lawsuit against it. However, Reynolds has standing because his bankruptcy trustee abandoned his claims against CSA. Reynolds admits that he neglected to list this claim in his bankruptcy petition, but argues that he corrected that mistake and subsequently added the claim to his bankruptcy petition. After CSA deposed Reynolds, his bankruptcy trustee abandoned the claim against CSA. Pls.' Reply at 7-8. Reynolds, therefore, regained the right to assert this claim. *See In re Carter Paper Co., Inc.*, 220 B.R. 276, 300 (M.D. La. 1998).

Nevertheless, CSA argues that the Court should hold that Reynolds lacked standing because he did not present evidence of the trustee's abandonment during discovery. A trustee may abandon his interest in a claim at anytime prior to the closing of the bankruptcy case. He does not have to notify third parties of his decision before any discovery deadline. *See* 5 COLLIER ON BANKRUPTCY § 554.02 ("Neither the Bankruptcy Code nor Federal Rule of Bankruptcy Procedure 6007 specifies the time in which the trustee must act to abandon."). If Reynolds's trustee properly amended his bankruptcy petition to exclude his claim against CSA, the trustee's abandonment reverts ownership of the claim to Reynolds. Accordingly, Reynolds has standing.

---

her claims for overdraft fees.

### G. Conclusion on Summary Judgment

CSA is a credit services organization under both CROA and TCSOA, and it violated both statutes. Moreover, the release Plaintiff McDaniel signed does not bar her claims, and Plaintiff Reynolds has standing to represent the class and subclass. However, CSA is not a debt management service under TDMSA, and therefore it did not violate TDMSA.

Accordingly, the Court (1) grants summary judgment for Plaintiffs on their CROA and TCSOA claims and (2) grants summary judgment for CSA on Plaintiffs' TDMSA claim.

### CONCLUSION

Plaintiffs may petition the Fifth Circuit for permission to appeal the Court's decision on class certification pursuant to Federal Rule of Civil Procedure 23(f) within ten days of the date of this Order. *See* FED. R. CIV. P. 23(f); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 302-03 (5th Cir. 2009).

Appeal of the class certification may be sufficient to put much of the Court's summary judgment analysis before the Court of Appeals, especially given the Court's reliance on this analysis in its Rule 23(b) predominance inquiry. *See supra* Part II(B)(1); *see also, e.g.*, *Mims*, 590 F.3d at 302-04 (holding that while the scope of Rule 23(f) appellate review does not include a general inquiry into the merits, appellate jurisdiction extends to the merits of plaintiff's case insofar as it relates to the merits of class certification); *Regents of the Univ. of Cal. v. Credit Suisse First Boston*, 482 F.3d 372, 380-81 (5th Cir. 2007) (same). However, the Court also makes the findings that 28 U.S.C. § 1292(b) requires for appellate review of its summary judgment rulings. *See Mims*, 590 F.3d at 304 (noting that appellate court's review in section 1292(b) appeal is not limited to issues of class certification whereas

appellate court is limited to class certification issue in Rule 23(f) appeal). Given the unsettled nature of the law with regard to the parties' motions for summary judgment on Plaintiffs' CROA, TCSOA, and TDMSA claims, the Court is of the opinion that its decisions regarding the parties' motions for summary judgment on these statutory claims "involve[] . . . controlling question[s] of law as to which there is substantial ground for difference of opinion." *See* 28 U.S.C. § 1292(b). It therefore believes an immediate appeal would "materially advance the ultimate termination of litigation." *See id.* Accordingly, the Court certifies its rulings on the motions for summary judgment for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[34]

Signed March 21, 2012.

David C. Godbey
United States District Judge

---

[34]28 U.S.C. § 1292(b) provides in relevant part:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

*Id.*

ORDER – PAGE 44